

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION



| | | |
|---|---|---|
| POSITIVE SOFTWARE SOLUTIONS, INC., | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | No. 3:03-CV-0257 N |
| | § | **JURY TRIAL DEMANDED** |
| NEW CENTURY MORTGAGE CORP., *et al*, | § | |
| | § | |
| *Defendants.* | § | |

## MOTION FOR CONTEMPT

Plaintiff Positive Software Solutions, Inc. ("Positive"), moves this Court to find New Century Mortgage Corporation ("NCMC"), John Norment ("Norment"), Kenneth Gardner ("Gardner"), Ophelia Camina ("Camina") and Barry Barnett ("Barnett")(collectively the "Contemnors") in contempt of this Court's Protective Order entered on April 28, 2003.[1]  Positive also seeks a finding of civil contempt against NCMC, Norment, Camina, Gardner and Barnett for violations of the Court's injunction issued on April 28, 2003.

### I.

### FACTUAL BACKGROUND

As a software developer and manufacturer, Positive's continued existence literally depends on its ability to protect and preserve its confidential proprietary information. Accordingly, Positive structures its business relationships in a manner that achieves the mutual goals of the parties

---

[1]This Court retained jurisdiction over violations of the Protective Order. *See* Protective Order, Docket No. 91 at 11, ¶ 23. Attached for convenience as <u>Exhibit A</u>.

---

**MOTION FOR CONTEMPT**                                                                    1

involved without sacrificing the confidential nature of its core assets. Its business relationship with Contemnor NCMC was no different. Even before this litigation was commenced, the preservation of the confidential nature of Positive's information (*i.e.,* software source code and related information) was of paramount concern. The Software Subscription Agreement ("SSA") entered into between Positive and NCMC on January 29, 2001 expressly provided: "Both Parties agree to receive and hold in confidence and not disclose in any manner to third parties...any...Confidential Information."[2] The SSA further provided that NCMC "understands and acknowledges that any disclosure or misappropriation of any Confidential Information in violation of this Agreement may cause Positive irreparable harm. . . ."[3]

On March 12, 2003, shortly after this case was commenced, this Court entered an Agreed Interim Protective Order directing that the documents filed in this proceeding not be disclosed or shared with anyone other than the parties' outside counsel.[4] Soon thereafter, the parties began negotiating the terms of a more comprehensive Protective Order for the purpose of protecting the confidential information at the heart of this case.[5] After several days of negotiating, the parties finally agreed to the terms of the Protective Order entered by the Court on April 28, 2003.[6] The agreed Protective Order specifically identified the categories of individuals that were entitled to use or disclose confidential information produced in the case and expressly provided, *inter alia,* that no

---

[2]Software Subscription Agreement, Exhibit B, at 5, ¶ 7.A.

[3]*Id.*

[4]Agreed Interim Protective Order, Exhibit C.

[5]*See* correspondence attached hereto as Exhibit D.

[6]Protective Order, Exhibit A.

---

**MOTION FOR CONTEMPT**                                                                 2

confidential information shall be made to non-attorney employees of the receiving party.[7]  There is no question, based on the negotiated terms of the parties' agreed Protective Order, that Contemnors appreciated the importance of maintaining the confidentiality of Positive's proprietary information.

On the same day the Protective Order was entered, this Court also entered its Memorandum Opinion and Order (the "Opinion") wherein it granted Positive's Motion for Preliminary Injunction and enjoined NCMC from any use of the LoanForce software, the LoanForce database, LoanTrack-1, LFMoon, and LTKMoon.  In the Opinion, this Court recognized that "New Century agreed in the Software Subscription Agreement...that Positive Software could apply to a court for preliminary relief to stop the disclosure or misappropriation of confidential information."[8]  This Court had the foresight to note that "[t]he fact that New Century has recently offered to quit infringing voluntarily does not eliminate the threat, as such a voluntary commitment could be withdrawn as easily as it was given."[9]

After granting Positive's Motion for Preliminary Injunction, this Court referred the remaining issues to arbitration.  Notably, the parties entered into an almost identical Protective Order in the arbitration proceeding, evidencing once again the critical importance of protecting Positive's confidential proprietary information.[10]

---

[7]Protective Order, Exhibit A, at 4, ¶ 3.

[8]Memorandum Opinion and Order, Docket No. 88 at 4, n. 4.

[9]Memorandum Opinion and Order, Docket No. 88 at 4, n. 12.  Indeed, this is exactly what happened.

[10]See Exhibit E, Arbitration Protective Order.

---

Incredibly; in the face of explicit contractual obligations, judicial decrees demanding the protection and preservation of Positive's confidential proprietary information, and an agreed Protective Order; the Contemnors defiantly disclosed Positive's proprietary source code, which had been clearly designated as confidential when produced by Positive, to NCMC's head of information technology. Despite an order prohibiting any use of the enjoined code by New Century, the enjoined code was copied, distributed and extensively manipulated. The Contemnors contempt is obvious and blatant and they should be appropriately punished.

## II.

## CIVIL CONTEMPT

A contempt order is reviewed for abuse of discretion, and underlying factual findings are reviewed for clear error.[11] A contempt order is civil in nature if the purpose of the order is (1) to coerce compliance with a court order or (2) to compensate a party for losses sustained as a result of the contemnor's actions.[12] A party seeking a civil contempt order must demonstrate, by clear and convincing evidence, "(1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[13] Intent is

---

[11]*Lynn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.2d 282, 290 (5th Cir. 2002); *FDIC v. LeGrand*, 43 F.3d 163, 165 (5th Cir. 1995).

[12]*Lynn-Lea Travel Corp.* at 290; *Crowe v. Smith*, 151 F.3d 217, 227 (5th Cir. 1998) (citing *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 829, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994)).

[13]*LeGrand*, 43 F.3d at 170 (*citing Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)); *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987).



not an element of civil contempt.[14]

**A.     The Contemnors stand in contempt of the Court's Protective Order.**

Protective orders were in place in November and December of 2003 in both this action and the pending arbitration.[15] This element of civil contempt is established.

The Protective Order entered in this case limits the use of Confidential Information to (a) disclosure to the Court and its personnel; (b) disclosure to outside counsel and outside counsel's support personnel providing active assistance in the litigation; (c) disclosure to experts who sign an undertaking; (d) disclosure to court reporters; (e) disclosure to interpreters and translators; (f) disclosure during depositions, provided that the deponent is not an officer, employee or agent of the receiving party; and (g) in-house counsel for the receiving party, limited to three persons whose identities are disclosed prior to the disclosure.[16] Other than in-house counsel, the Protective Order strictly prohibits disclosure to *any* other employees.[17]

The Protective Order also strictly prohibits outside counsel from sharing the Confidential Information with their clients.[18] Even if a client representative were going to be used as an expert,

---

[14]*Id.*

[15]*See* <u>Exhibit E</u> (Arbitration Protective Order) which contains almost identical language to that found in the Court's Protective Order.

[16]Protective Order, <u>Exhibit A</u> at 3-4, ¶ 3.

[17]*See* Protective Order, <u>Exhibit A</u> at 4, ¶ 3 ("No disclosure of Confidential Information shall be made to other [non-lawyer] employees.")

[18]*See* Protective Order, <u>Exhibit A</u> at 4, ¶ 5 ("Nothing in this Order shall preclude or impede Outside Counsel's ability to communicate with or advise his or her client based on his or her review and evaluation of Confidential Information produced by the opposing party, <u>provided</u> that such communications or advice shall not disclose or reveal such Confidential Information.")(emphasis in original).

---

**MOTION FOR CONTEMPT**                                                                5

something not contemplated (and in fact prohibited) by the Protective Order, the client representative would still be forced to sign an undertaking and allow his or her identity to be disclosed to the opposing party in order to allow for objections.[19] It is clear that the Protective Order required certain identified conduct by NCMC and its counsel. The second element for civil contempt is met.

The conduct by the contemnors clearly violated and continues to violate the Protective Order. Mr. Norment clearly enjoyed access to Positive's proprietary and confidential source code in November and December of 2003, long after the Court's entry of the Protective Order.[20]   Mr. Norment is not a lawyer, so he could not have viewed Positive's Confidential Information pursuant to paragraph 3(g).[21]   Mr. Norment, as head of NCMC's retail division's information technology department[22] was expressly excluded from those persons authorized to view Positive's Confidential Information pursuant to Protective Order paragraph 3(g). Mr. Norment has not been designated as an expert, and he has not provided an undertaking which would have allowed Positive to object to any attempt to designate him as an expert.[23]

To allow the head of NCMC's information technology department to view Positive's most sensitive Confidential Information is inexcusable, and in clear contempt of this Court's Protective

---

[19]See Protective Order, Exhibit A at 6, ¶¶ 9-10.

[20]The disputed materials were created in November and December of 2003 by Mr. Norment.  In creating the disputed materials, he used a copy of LoanForce as it existed on April 8, 2003.  Mr. Norment's repeated representations under oath that he did not view any of the Confidential Information after April 18, 2003 proved false.

[21]See Excerpts from Deposition of John Norment ("Norment Deposition") at 201:21-201:23, attached hereto as Exhibit F..

[22]Norment Deposition at 105:20-106:4.

[23]See Declaration of W. Ralph Canada, Jr., attached hereto as Exhibit G.

---

Order. The use by Mr. Norment of the Confidential Information was not innocent, as he admits (1) he was aware of and, in fact, read the Protective Order;[24] (2) he was provided the Confidential Information by counsel or someone instructed by counsel to provide him with the Confidential Information;[25] and (3) according to NCMC's counsel, Mr. Norment used the Confidential Information in an effort to assist counsel in the defense of Positive's claims.[26] It is clear that NCMC and its counsel fully participated in, arranged for and sought to benefit from Mr. Norment's contemptuous access to and use of Positive's Confidential Information.

Incredibly and disingenuously, NCMC's counsel claims that the Protective Order does not cover the information reviewed and used by Mr. Norment because it consisted of software code in NCMC's possession before the suit was filed. This argument ignores the fact that NCMC represented to the Court that it no longer possessed the LoanForce code after Dr. Udo Pooch "cleansed" NCMC of it on April 18, 2003. Apparently, NCMC felt "cleansed" of the LoanForce code even though the head of its IT department had an illegally created a copy of it on his computer

---

[24]Norment Deposition at 128:4-128:6, 169:2-169:25.

[25]*Id.* at 142:19-143:23. When Mr. Norment was asked the identity of the person who provided him with the Confidential Information, Ms. Camina (Norment's counsel and fellow contemnor) asserted a privilege based on the work product doctrine and instructed Mr. Norment not to answer. Based on Ms. Camina's own "definition" of the work product doctrine, to covers "anything that is done at [Ms. Camina's] instruction." *Id.* at 142:25-143:1. Therefore, the assertion of the work product privilege leads to the inescapable conclusion that Ms. Camina "instructed" Mr. Norment to view the Confidential Information or "instructed"another individual to provide the Confidential Information to Mr. Norment.

[26]*See* correspondence from NCMC's counsel claiming that Mr. Norment's use of the Confidential Information is subject to the attorney-client privilege and attorney work product doctrine, attached hereto as Exhibit H.

**MOTION FOR CONTEMPT**                                           7

via a CD-rom.[27]   The Protective Order does not specifically address code already in NCMC's possession for a reason: NCMC intentionally misled the Court and Positive into believing that all copies of LoanForce had been deleted when in fact they had not.[28]

## B.   The Contemnors also stand in contempt of the Court's April 28, 2003 injunction.

On April 28, 2003, this Court entered a Memorandum Opinion and Order enjoining NCMC "from any use of the LoanForce software, the LoanForce database, LoanTrack-1, LF_Moon and LTK_Moon."[29]   The Court included in the Memorandum Opinion and Order the following directive, "It is further ORDERED that New Century delete or return all LoanForce software, including application software and the database, that New Century has the ability to access (excepting materials produced in discovery for use in this litigation and/or arbitration)."[30]   By Order dated April 29, 2003, this language was completed deleted.[31]   NCMC never made any attempt to have the Court restore the "use in litigation" exception language.

Positive asked the Court to modify the April 29, 2003 by restoring the instruction that New Century "return" the enjoined code, but later discontinued those efforts when New Century filed two declarations from Dr. Udo Pooch wherein he claimed to have deleted all copies of the proscribed software to the point that New Century was "cleansed" of its presence.   With all copies deleted other

---

[27]The actual number of copies circulating within New Century is unknown.

[28]Positive now seeks the return of all enjoined software in a separate motion filed contemporaneously herewith.

[29]Memorandum Opinion and Order, Doket No. 88 at 17; *see also* Docket No. 94, Order dated April 29, 2003 and Docket No. 101, Order dated May 2, 2003.

[30]Memorandum Opinion and Order at 17.

[31]*See* Docket No. 94.

than those in possession of counsel, Positive reasonably concluded, as did the Court, that none existed for New Century to return.  At this point, the proscribed software, to the extent it did exist after Dr. Pooch's "cleansing," could not be used in *any* manner by New Century per the remaining language in the Memorandum Opinion and Order.  To the extent Confidential Information (as defined in the Protective Order and Software Subscription Agreement), was later produced to New Century's counsel in the litigation, the agreed Protective Order prohibited access to it by NCMC employees other than in-house counsel disclosed in advance.

On May 2, 2003, the Court gave NCMC more explicit instructions on exactly what information was to be maintained, ordering NCMC to "preserve all extant backups or images of all servers or personal computers that now  or previously contained any portion or part of LoanForce, LoanTrack-1, LTKMoon, LFMoon, LoanTrack-2, or MLAS, and any associated software, whether used for development, debugging, deployment, production or otherwise, including source code, object code, history or log files, or revision tracking files (particularly including any backups of servers or personal computers from which files were deleted under the direction of Dr. Pooch), and to refrain from deleting any such files still resident on any servers or personal computers, and to preserve all extant backups or images of all e-mail servers, pending further order of the Court or directive of the arbitrator."[32]   Nothing in the May 2, 2003 Order, however, altered the Court's Memorandum Opinion and Order that stated no use was to be made of the proscribed programs by NCMC to the extent not deleted.

In direct contravention of the Court's Orders, not only did NCMC, at the direction of its counsel make use of the LoanForce software, *it copied and distributed it* in October and November

---

[32]Docket No. 101 at 1-2.

2003 within NCMC's retail division's information technology group. The use by Mr. Norment described above was clearly prohibited by the Court's Memorandum Opinion and Order prohibiting "any use of the LoanForce software, the LoanForce database, LoanTrack-1, LF_Moon and LTK_Moon."[33] Mr. Norment is clearly not a person authorized under the Protective Order to even view, much less manipulate and copy the LoanForce code.[34] Under any circumstances imaginable, access to and use of Positive's proprietary code and Confidential Information by NCMC's information technology employees clearly places NCMC, the individuals involved and their counsel in contempt of this Court's Orders.

**C.    Positive requests a full evidentiary hearing.**

When Positive learned of NCMC's violations of the Court's Protective Order and Memorandum Opinion and Order, it sought to elicit testimony from John Norment on his use of the proscribed software. At his deposition, NCMC's counsel refused to allow Mr. Norment to testify on the following topics:

1.    When Mr. Norment last enjoyed access to the proscribed software;

2.    What uses Mr. Norment had made of the proscribed software;

3.    The identity of other persons at NCMC who had been provided access to the proscribed software by Mr. Norment or others;

---

[33]Memorandum Opinion and Order, Doket No. 88 at 17; *see also* Docket No. 94, Order dated April 29, 2003 and Docket No. 101, Order dated May 2, 2003.

[34]Even if the Court were to *sua sponte* reinstate the language allowing the use of the LoanForce software in this proceeding or arbitration, such use is limited by the terms of the Court's Protective Order which certainly has been violated. The reinstatement of the litigation use language also would not justify the copying of Positive's proprietary software code.

---

4.      The content of any work product created as a result of the illicit use of the proscribed software by Mr. Norment or others;

5.      The persons from whom, or by whose authority, Mr. Norment and others had gained access to the proscribed software;

6.      The identity of persons granted access to the work product created by Mr. Norment (and others) as a result of their access to the proscribed software;

7.      Whether Mr. Norment and others at NCMC still maintained access to a copy of the proscribed software or work product derived from the proscribed software at the time of his deposition;

8.      Whether Mr. Norment was aware of the Protective Order and/or the Memorandum Opinion and Order at the time he was accessing and using the proscribed software in November and December of 2003;

9.      Whether Mr. Norment or any other person has run queries or otherwise used the .mdf and .ldf files for the proscribed programs and the results of such queries; and

10.     The basis for any privileges to answering questions on the above issues.

A full evidentiary hearing with the following witnesses present and compelled to testify would answer most, if not all, of the above questions: John Norment, Derong LaBrie, Austin Sheppard, Ophelia Camina, Kenneth Gardner and Barry Barnett.

### III.

### SANCTIONS

Upon hearing and creation of a full record on these issues, Positive will ask the Court to impose sanctions supported by the evidence. Until the record is complete, however, it would be

---

premature to specify the exact sanctions necessary to punish the Contemnors for their wrongdoing, deter future conduct by NCMC and its counsel and to compensate Positive for the damages it has suffered as a result of the contemptuous conduct. At the very least, however, NCMC should be required to disgorge any work product related to use of or access to the proscribed programs by NCMC employees since April 28, 2003, and if counsel for NCMC knowingly participated in such conduct, their disqualification.  Positive asks the Court to expedite the hearing on this motion, as NCMC's contempt appears to be ongoing, systemic and designed to harm Positive.  Positive also requests by separate motion the immediate return of all copies of the proscribed programs, as New Century and its counsel clearly cannot be trusted to hold them in the manner agreed upon by the parties and ordered by the Court.

Respectfully submitted,

**OF COUNSEL**

**STEVEN THRASHER**
State Bar No. 00797555
391 Sandhill Drive, Suite 1600
Richardson, Texas 75080
(972) 918-9312
(972) 231-2686 (Fax)

**W. RALPH CANADA, JR.**
State Bar No. 03733800
**MICHAEL W. SHORE**
State Bar No. 18294915
**JEVEN R. SLOAN**
State Bar No. 24039177
**ALFONSO GARCIA CHAN**
State Bar No. 24012408

**SHORE ★ DEARY, L.L.P.**
State Bar No. 24012408
2515 McKinney Avenue
Suite 1565
Dallas, Texas 75201
(214) 292-2600
(214) 739-3879 (FAX)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served upon all the following on the 31st day of December, 2003:

*Via Facsimile*
Ms. Ophelia Camiña, Esq.
Mr. Barry Barnett, Esq.
Mr. Kenneth Gardner, Esq.
Susman Godfrey, L.L.P.
901 Main Street, Suite 4100
Dallas, Texas 75202-3775



Michael W. Shore

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that attempts were made to conference on the issues raised herein with Ophelia Camina at the deposition of John Norment (refused by Ms. Camina) and on the telephone with Mr. Barnett (calls not returned) without agreement. The matters are submitted to the Court for determination.

Michael W. Shore
Attorney for Plaintiff

---

**MOTION FOR CONTEMPT**                                              **13**